Case No. 251617, Kevin Hamm v. Pullman SST Inc. Oral argument not to exceed 15 minutes per side. Ms. Cortese for the appellant. Good morning, Your Honors. May it please the Court. Good morning. Annette Cortese appearing on behalf of the appellant, Kevin Hamm. Your Honors, Mr. Hamm was a man who was working a job. He was trying to provide for his family. Once he shared with a coworker in conversation that he was bisexual, he then became subject to absolutely extreme and outrageous harassment based on sex. The record taken in the light most favorable to Mr. Hamm, as is required on a summary judgment motion, shows that he was subjected not just once, not twice, but on a relatively regular basis to being called one of the most degrading and outrageous slurs that a gay or bisexual person could be called. And we submit, Your Honors, that the record read in the light most favorable to Mr. Hamm did satisfy the requirement that the balancing of the severe and the pervasive, that he met the standards for a claim for harassment based on sex, and that this claim should have proceeded to a jury. What do you do with the counterargument that the response was pretty vigorous by the HR employee, Jacob? She interviewed your client, interviewed nine other people, and even though she couldn't corroborate your client's claims, she still did a fair amount of preventative measures by requiring the employees to have in-person training and everybody else to sign the anti-harassment policy. A couple of responses to that, Your Honors. First of all, again, in the light most favorable to the plaintiff, and even is recognized by the district court, certainly Kevin Hamm testified that as this harassment escalated, he went to his manager, Mr. Ruff, and the company's own policy, and we cite this in our briefs, Your Honor, the company's own policy says that if you are harassed, the first thing the company says to do is try to talk to your harassers, let them know you don't appreciate being harassed. The second thing the company says to do is to go to your manager, essentially to follow chain of command, and the record shows that that, in fact, is what Mr. Hamm did, that he went several times to Mr. Ruff. He put Mr. Ruff as management on notice that he was being subject to this harassment, and his testimony is, even after putting Ruff on notice, that the harassment still continued. So just to clarify, is your theory then that Jacob's investigation was okay, it just didn't happen soon enough, and it should have been in February when he first complained to Ruff? In part, Your Honor, certainly. Number one, also significantly, Ruff didn't say to him, Ruff's the manager, Ruff has authority on behalf of the company, should be familiar with the company's policies. He did not say to him, Mr. Hamm, if this is going on, you should go to Human Resources. He didn't go to Human Resources. So when your client first approached Mr. Ruff in February, he said he didn't want to get anybody in trouble, he only gave a couple of vague comments, not what he later testified to. Mr. Ruff says, I'll handle it, talks to the individuals, and then calls your client a week later, and your client says, everybody's, I forget the exact phrase, but everybody's staying away from me, I think it's actually worked. So why wasn't that, I mean, it seems to me that the employer's burden in terms of their response should be commiserate with kind of complaint filed, and so if you file an informal complaint, I just want it to stop, I don't want anybody to get in trouble, why wouldn't Ruff's kind of informal response not be sufficient? Well, because unfortunately Ruff's response was not sufficient. The harassment did not stop. Hamm says he went back to Ruff, I believe it was in March, and again put Ruff on notice that the harassment was continuing. Hamm followed the procedures outlined by the company, he followed the process, and again, unfortunately, it did not result in the harassment stopping. Also with regards to Jacobs' investigation, Jacobs in fact found the charge that it wasn't substantiated, and Jacobs did not provide any assurances to Ruff to say, I have investigated this, this is going to be dealt with, these guys will not harass you any further, this will not continue. I don't think, I mean, your position seems to be that employers have a duty to believe employee complaints of harassment, but I don't think that can be the law. If an employer does an investigation and reaches the conclusion that there's just no credible evidence that this took place, it strikes me that that is the response that Title VII requires. I don't see anywhere that they require that employees have to be believed if the statements are not found credible. Well, what the law requires is that the employer take actions so that an employee is not subject to having to go to a workplace that is subject to harassment based on that employee's sex, and significantly in the record, taking the record most favorably to Hamm. Hamm goes back to Ruff. He reports to Ruff the first time I think in February. He goes back to Ruff in March 2021, and according to the lower court's opinion and order at record page ID 584, Hamm again reported to construction manager Ruff in March 2021 that he was, quote, still being called a faggot. Quote, by his coworkers. Ruff again did not direct Hamm to human resources or do anything to actually substantively address the harassment, simply telling Hamm he would take care of it. So I think what the jury could look at, Your Honor, is that period of time where before Ruff goes to human resources, where, I'm sorry, strike that, before Hamm goes to human resources, where Hamm is telling Ruff this is what's going on, this is what's happening. The first time he reports it, Ruff says he's going to take care of it. Hamm hopes that that puts the end to it, but it does not. According to Hamm's testimony, it doesn't. Do you think it matters? Does the employer who learns about the harassment, does the employer have to know that it's on the basis of sex? Because I don't think your client ever told Ruff about his sexual orientation. And so Ruff testified that he didn't even know your client's sexual orientation. So do you just assume that this slur, because sometimes you don't use the slur based on sexual orientation, you just say it about anybody. Do you think it matters that he might not have known of your client's sexual orientation? I think a couple of responses to that. Number one, Ruff did make inquiries to that. Number two, it says harassment on the basis of sex. Certainly calling somebody a faggot, a reference to being a homosexual, engaging in homosexual activities, that can certainly, a reasonable jury, a reasonable jury could find that is a comment based on sex. And a reasonable jury could find that that was sufficient notice to put Ruff as a manager on notice that Hamm was being subject to harassment based on sex. Ruff also could have thought, okay, if this is just joking around amongst guys and Ruff doesn't care and it doesn't personally affect him, why would Ruff come to him to complain? The law does not require, I don't think, Your Honor, that Ruff or that Hamm say to Ruff, you know, Mr. Ruff, I'm invoking my rights under Title VII. I'm being harassed based on my sex. I'm going to cite some cases. I think a reasonable jury could find that an employee going to his manager and saying, my coworkers are calling me a faggot and this is what they're doing to me, that at least puts, and the manager says, I'll take care of it. That at least puts the company on notice and at least at that point in time provided some responsibility on the part of the company to do what Ruff said he was going to do, which was to put a stop to this harassment of Mr. Hamm, which in fact the company did not do. Ms. Cortez, my notes say the following, and when Ruff learned of some of those details during Jacob's investigation, he readily agreed to Hamm's request to transfer. So Hamm himself answered yes when asked if Ruff had treated him fairly, which confirms Ruff's good faith. Do you dispute any of that? I, what I would say is he was acknowledging that Ruff was treating, perhaps he was acknowledging that Ruff was treating him fairly in that context to say, yes, Ruff is going to transfer me and that, you know, if I can be transferred, you know, I don't want to have to work with these guys again. He was transferred, wasn't he? No, what happened was he went off on medical leave. Oh. And then that's the issues on the retaliation claim and the genuine issues of material fact. But his request for transfer was granted, right? Again, he was told he was going to be transferred. Okay. So, I mean, it sounds to me like he admitted what they did was correct. So is your argument that they didn't do it timely? Yes. That there was a delay and that's the whole crux of your case? Yes. For the sexual harassment part of the case, yes. It's the time period between when... But they're entitled to investigate, aren't they, before they actually transfer him and before they discipline co-workers? I mean, they're entitled to do an investigation, are they not? They're certainly entitled to do an investigation. I know. But the issue was what he was subject to before things got so bad. The final incident where, you know, the records showed that Martinez, he testified that Martinez said to him basically, you know, I'm paraphrasing but, you know, pretty accurately, you know, get the fuck out, faggot. What I think a jury can focus on and ask themselves as a jury is that period of time from when he went to RUF and the period of time that he's gone to RUF twice until the final incident where things get so bad that he does go to HR. That what he was subject to in that time period when the company had noticed, a reasonable jury could find that that did meet the standards under Harris v. Forklift and under Sixth Circuit case law of harassment based on sex. And then there's also the issue the company promised him a transfer, promised him a different position, but then ended up terminating him anyways. Thank you. You'll have your, let's see, what did you ask for? Four minutes rebuttal. Thank you, Your Honors. Good morning. Good morning, Your Honors. Carl Maznak on behalf of the Apelli Defendant Pullman SST. Your Honors, at summary judgment, the district court correctly ruled that the alleged harassment was not objectively severe or pervasive enough to establish it. I don't think that's the strongest argument. I know the district court ruled, one, that it was not severe and pervasive, but the district court also ruled, well, even if it were, the company took appropriate redeeming actions, remedial actions. I'm kind of on the fence as to the first grounds, and I think this is pretty severe, pretty horrible, pretty widespread. And I think maybe you'd be better arguing the second grounds, that maybe the company, assuming this was a hostile work environment, whether or not the company took appropriate actions. I think that's their stronger position. You can argue whatever you want, but to me, that's the stronger position. Yes, Your Honor. I'll take your guidance from you. So moving on to the remedial action point. The summary judgment also ruled, I'm sorry, the district court also ruled that summary judgment was appropriate on the harassment claims for the separate independent reason that Pullman took prompt corrective action to foreclose any possible exposure to harassment after it received the April 29th action. The best argument on the other side on this point, it seems to me, is Ruff took appropriate informal action maybe in February, but the record just leaves unclear. In summary, he said in March when Ham returned to him, I'll take care of it again. And the record doesn't leave, it's not clear what happened after that, between that mid-March and then the April formal complaint. Your Honor, you are correct. The record is unclear because Mr. Ruff didn't recall these conversations happening, so we're only going off of the deposition testimony of Mr. Ham. But Mr. Ham testified first with respect to his February 15th complaint to Mr. Ruff that he told Mr. Ruff without giving any names that somebody said that Mr. Ham reminded him of Kevin Bacon, I quote, the gay faggot that got chopped up, end quote. He didn't tell Mr. Ham, he didn't tell Mr. Ruff that he was bisexual or that he was offended because of his sexual orientation. He didn't give any more context of who said this or why Mr. Ham was upset. But as Your Honor noted, Mr. Ruff responded, okay, let me go talk to the crew, let me investigate. And he did. He went to the site and the investigation report notes that Mr. Ruff talked to the crew and then a week later he checked back with Mr. Ham. And Mr. Ham at that point said he had not heard any more offensive comments and he in fact reported that the crew was treating him a little bit nicer. And so from that point of view, Mr. Ruff did what he was supposed to do given the scope of the complaint that was given to him. Addressing next the March complaint, there's very little in the record on this, but Mr. Ham did testify that sometime in March he said that his coworkers kept calling him a faggot. And again, Mr. Ruff didn't know his sexual orientation, but he still at this point said, okay, let me look into it. The record doesn't show what happened after that, but it's clear that from his own deposition testimony, Mr. Ruff did not express the level of indifference that this court would require to hold Pullman liable. It's clear that Mr. Ruff agreed to follow up on these comments, on these complaints. He agreed to investigate and counsel the crew. And even if ultimately Mr. Ruff was ineffective at that point in time, this court has ruled that an employer's remedial action need not be perfect. And that an employer can only be held liable if its response exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination. And I think when we get to the April 29th complaint, that's where Mr. Ham's case totally falls apart. As your honors pointed out, the Pullman's response after receiving the April 29th complaint was immediate and it was appropriate. And opposing counsel didn't have any good arguments to show what Pullman could have done that was different, what it could have done that was better. They interviewed Mr. Ham, Mr. Martinez, and eight other witnesses from April 30th to May 3rd, and none of them, not one of them corroborated Mr. Ham's allegations of unlawful harassment. And yet Pullman still took prompt action to prevent any possible harassment from occurring by granting, as your honor mentioned, Mr. Ham's request to transfer to another site. That grant happened during that call on May 3rd when Ms. Jacob reached out to Mr. Ham to let him know the results of the investigation, that he couldn't substantiate the allegations. So immediately they agreed to grant his request to transfer to another work site so he would never have to work with another member of his crew. And then in addition to that, Pullman conducted extra anti-harassment training. It recirculated its anti-harassment policy for everybody to review. It's clear that Pullman did what it needed to do under its obligations under Title VII as the district court ruled. Let me briefly circle back to the first point and then I'll move on to the retaliation claims. While I understand that your honor is on the fence, I think the record shows that contrary to opposing counsel's representation, that the conduct here occurred on a relatively regular basis. I think the record is clear that Mr. Ham at most was subject to around a dozen comments that could arguably be tied to his sexual orientation over a period of six months. And these comments at most comprised mere offensive utterances that didn't involve any physical intimidation or threats, didn't in any way interfere with his ability to do his job. Say this was a racial discrimination case and somebody is accusing an African-American and using racial slurs against an African-American. And you say it's only a dozen times over six months. I mean, that's pretty severe and regular, isn't it? And wouldn't that be a hostile work environment if this were a racial thing? Under this court's prior rulings, no, your honor. I mean, it's not isolated comments. I mean, it's a dozen comments and they're very offensive. There's no doubt that these comments are offensive and inappropriate for the workplace. Pullman doesn't dispute that. But under this court's prior rulings, including in Loveless v. BP, that also involved 12 incidents of racial harassment over eight months, including multiple uses of the N-word. Yeah. Well, I don't know if I doubt I was on that opinion. But I mean, I just think it would be hard for an employee to continue at a job when you're constantly getting barraged with this. It is so distracting. Anyway. He did say it affected his employment. Like the last event, he went home because he couldn't take it anymore. Well, your honor, what happened there was actually before he said that he was going home, he had a conversation with Mr. Martinez and he told Mr. Martinez, I'm going home. Mr. Martinez asked him, have you done your work? He said no. And it was at that point that Mr. Martinez made the comment, get the F out of here. So clearly he was leaving before that ever happened. There's nothing in the record to actually show that Mr. Martinez or anybody else at Pullman or any of the alleged comments interfered with his ability to do his job. The record shows that from the date of his hire up until that last day on the site, he performed his job without issue. What was he on? I thought he was on medical leave because of the stress associated with this. Yes, your honor. After April 29th, he did go out on medical leave. He asked on May 3rd when the investigation was told to him to go out on leave while they find a new assignment for him. Wasn't the basis of the medical leave the stress that was associated with the harassment at work? Yes, your honor. Well, right after that, he submitted the doctor's note that said he's clear to return to work without restrictions, even though he's being treated for anxiety. And so the record doesn't show that he needed this leave because he was so overwhelmed and couldn't do his job. The record shows that he requested leave while they found another assignment for him and that he was clear to return to work without restriction as early as May 10th. This is a construction site, isn't it? Yes, your honor. I assume that the workers don't work totally independently. They probably work together doing a task together. And if you're working with two or three other guys and they are harassing you, it's pretty hard, it seems to me, to do your job if you have to rely on these other guys who are just totally harassing you personally at the time. I mean, it seems to me it would be very hard to finish your tasks, that's all. Well, Mr. Hamm testified his primary interaction was with Bradkin, his co-worker, who he had a friendly relationship with who didn't harass him. All of the other co-workers worked on the work site, which was very large, over a mile square feet. And his testimony during his deposition was that he only occasionally interacted with anybody else. So it's not like he's working close, side by side. What was he doing on the construction site? He was a shotcrete nozzle man, so he was spraying shotcrete on pillars. So that is kind of an independent job. It is. His primary partner was Bradkin, who helped him operate that. Okay, was Bradkin one of the alleged harassers? No, your honor, there is no allegation. In fact, he testified he had a friendly relationship. All right, so you're saying these other guys on other parts of the construction site that he doesn't. Okay, all right. So very briefly, let me turn to the retaliation claims, which are important and which were not addressed in much detail by my opposing counsel. The district court correctly dismissed the retaliation claims because Mr. Hamm failed to present evidence, a pretext to rebut Pullman's legitimate reason for ending the relationship, which was that Mr. Hamm rejected five separate work assignments after he left on April 27th. Mr. Ruff proposed these five different assignments throughout May of 2021. And during each of these conversations, Mr. Hamm shut him down, objecting to every single possible assignment for various. Do you think it would have been better for Ruff to say, look, you got to accept this or we're going to have to let you go? I mean, the ending of the relationship was kind of unusual in the sense of he says I'll get back to you on Friday and then kind of just never responded again. And then Hamm had to talk to Jacob. And then that's when she said this. It's like wouldn't it have been better, don't you think, to have said, well, these are the only options we have for you. So you have to either take him or leave. It would undoubtedly make for a clearer record, Your Honor. I agree. But I think the record does show from the communications between Mr. Ruff and Mr. Hamm that Mr. Ruff was truly trying to find something that would work for him. He tried to accommodate him with the distance. He tried to accommodate him with his various restrictions. And so in the moment, Mr. Ruff always said, let me see if I can find something for you. But as the district court ruled below, it's reasonable to assume that after the fifth rejection, after the fifth proposal and the fifth rejection, Mr. Ruff's appetite for continually trying to find him additional work would dampen. And that is, as Your Honor mentioned, is exactly when he went to speak to other members of Pullman management. What do you make of the response that Hamm actually never expressly rejected and that they were kind of just debating what was the best fit? Your Honor, it's a red herring. Ultimately, it doesn't matter if Mr. Hamm formally rejected or Mr. Ruff formally offered him each job. What's important and what the record shows is that Mr. Ruff suggested or brought up at least five different distinct opportunities, with start times, actual work, actual locations. And each time that he did that, Mr. Hamm said, I don't like this for one reason or another. He found some fault with each assignment. And at that point, it's reasonable, as the district court ruled below, for Mr. Ruff to conclude, well, it's futile to discuss this any further since Mr. Hamm is clearly not interested and not willing to do this job. And he rejected these for various personal reasons that had absolutely nothing to do with the alleged harassment. He didn't like the commute of one. One of them said he would hurt his shoulders. He was afraid of heights for another one. He had a doctor's appointment that conflicted with another one. So ultimately, Mr. Hamm found some reason to reject every single one of these offers. And Pullman didn't have an obligation under the law to keep offering him jobs that were tailored to his every particular desire. The unrefuted record shows that Pullman offered Mr. Hamm every available assignment that accommodated his various restrictions, but he rejected each one of them. And for those reasons, I respectfully request that this court affirm the decision. Thank you. Any further questions? Judge Gilman? Judge Murphy? All right. Thank you, counsel. All right. Four minutes rebuttal. Yes. Thank you, Your Honor. Your Honors, talking about the remedial measures and whether or not they were effective, and talking about what happened after in March. Is the question whether they're effective or whether they're appropriate or whether they're proper? I mean, I can see that some remedial measures may not work, but I don't think that's the standard. If they're reasonable, even if they don't work, there's no liability, is there? Well, I think what the standard is, it goes back, and this is something that I think. It's not strict liability, is it? Well, no, but it goes back, Your Honors, to kind of what the United States Supreme Court was getting at in Ames, which is you go back to Title VII. You go back to what Title VII says, which says it prohibits discrimination based on sex in the workplace. And the law on hostile environment sexual harassment, what it does say at the end of the day, Your Honor, is that under the law, employers can be held liable and responsible if there is a workplace where an employee's ability to perform their job is affected by sexual harassment in that workplace. So an employer doesn't just have a duty to investigate sexual harassment. It has a duty. You're saying it is strict liability. I'm not saying it's strict liability, Your Honor, no. But what I'm saying is a reasonable jury can look and say, was what the employer did reasonable? Okay, that's the standard, is the reasonableness of the action to it. Yes, and we would submit, Your Honor, that on a question of reasonableness, that is a question for a jury, Your Honor. A jury, a jury, Pullman can argue to a jury. Pullman can argue to a jury that we did everything we were supposed to. Once he went to HR, Jacob got involved. So what are you saying they should have done? I know you say they should have done it sooner, but what specifically in detail should they have done that they did not do? One thing I would argue to the jury, Your Honor, that they could have done and didn't is if Ruff, as a manager, if Ruff went to these guys and he said, listen, I don't ever want to hear about any of you ever calling this guy the F word again. Here is our sexual harassment policy. Here is how seriously the company takes this. And, you know, or Ruff could have said, Mr. Ham, we need to get HR involved. He could have done that. He could have told the guys. It still cuts off liability in April because Jacob did do that. Yes, so. She did tell everybody to re-sign the anti-harassment policy. Yes, so certainly the sexual harassment claims, Your Honor, would be considered by the jury from November through April, through that final incident of April. And the jury would be asked, did Pullman do every, did Pullman take prompt remedial measures on being on notice of sexual harassment to ensure that Mr. Ham could go to work without being sexually harassed? That's all he was asking for. He just wants to do his job. He wants to do it without being called the F word and without being sexually harassed. And one thing that was in the record, even after he complains in March, he testifies on the record that in the incident, April 29th, 2021, that Martinez asked, where in the F are you going? Ham said he was looking for air tool oil. Martinez began yelling and said, get the F out of here and go F yourself, faggot. So even in April, even after he's complained, he testifies that he's still being called the F word. So we submit, Your Honor, that there is genuine issues of material fact, and it's a question for the jury. Did Pullman act properly? Did they act promptly? Did they not? Was Mr. Ham still, even after complaining twice to management, was he still subjected to this very severe sexual harassment? And we submit that's a jury question. On the retaliation issue, again, this is a situation where the district court construed the record in the light most favorable to Pullman. Pullman now says it doesn't really matter if it's characterized as an offer or a discussion, but it does matter because Pullman stated that their legitimate reason for termination to overcome the inference of retaliation, they said our legitimate reason was we terminated him because he refused multiple job offers. If, in fact, that articulated reason does not have the basis in fact, if he did not refuse job offers, then that legitimate reason falls away, and a jury can again find that contrary to transferring him as Pullman said they were going to do, that Pullman, in fact, simply terminated him. I thought he did refuse job offers. Is that wrong? No, Your Honor. Our contention is he did not ever refuse a job offer. What happened, Your Honor, is after the harassment, he went off on medical. And while he was off on medical, before he came back, so his manager, Ruff, conceded in his deposition, you can't, nobody who's off on medical can go to a job site. They can't work. So while he's off on medical and not returned to work by his doctor, Ruff calls him, and he has, in the light most favorable to Ham, some kind of casual conversations with him, one of which is, what would you think about Toledo or Cincinnati? And this is Michigan. And Ham says, hmm, isn't that a bit of a hike? Okay. There's some discussion about Ham doing some demolition work. Ham said okay to go to Toledo? Is that what you're saying? No, what Ham said. It's a casual conversation, Judge. It's not a job offer. I realize that, but I thought he said he didn't want to go. No, I think what he said was, isn't that a bit of a hike? Okay, that's what Ham says. Yes. Implying that he doesn't want to travel to Toledo. Implying that Cincinnati might be a bit of a hike, but if the employer had actually made a job offer, if the employer had said, Mr. Ham. Okay, so you're saying these weren't real job offers.  They were just suggestions. They're discussions. That he didn't like. Yeah. Okay, I recognize your argument. It's the manager kind of going, we got this guy. You're way out of time here. Oh, I apologize. No, if you want to wrap it up, I'll give you another minute or so. Yes, Your Honor. Again, what I would say is there are, construing the record in the light most favorable to Mr. Ham, if you review our brief, you review the record, a jury could find these were not job offers. He did not refuse job offers. These were some discussions that he had while he was off on medical. Once he got back from medical, the company, once he could work, the company did not give him any job offers. The company simply terminated him. Thank you. Any further questions? Judge Gilman? Okay. Thank you, Your Honors. All right. Thank you, counsel, for your argument. Case will be submitted. May call the next case.